

US BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed November 16, 2010**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ROBERT TINSLEY, | § | CASE NO. 09-36036-SGJ-7 |
| | § | |
| DEBTOR. | § | |

**MEMORANDUM OPINION AND ORDER DENYING THE TRUSTEE'S OBJECTION TO HOMESTEAD EXEMPTION [DE # 17] AND AGRILAND'S OBJECTION TO DEBTOR'S CLAIM OF EXEMPTIONS [DE # 18]**

Before this court is the Objection to Homestead (the "Trustee's Objection") brought by Robert Yaquinto, Jr., the chapter 7 trustee (the "Trustee"), and the Objection to Debtor's Claim of Exemptions (the "Agriland Objection" and, collectively with the Trustee's Objection, the "Objections") filed by creditor AgriLand, PCA ("AgriLand"). The court held a hearing on the Objections on June 8, 2010 (the "Hearing"). This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). This memorandum opinion constitutes the court's

1

findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. Where appropriate, a finding of fact will be construed as a conclusion of law and *vice versa*. Upon consideration of the evidence and applicable legal authority, the court concludes that the Objections should be overruled.

I.    Factual and Procedural Posture

Robert Tinsley (the "Debtor") filed a voluntary chapter 7 bankruptcy petition on September 10, 2009. The Debtor describes himself as a rancher. The Debtor received a discharge on December 16, 2009. The Objections raised by the Trustee and AgriLand seek to invalidate the Debtor's homestead exemption claimed as to 116 acres of land (and the improvements thereon) located at 6330 County Road 149, Kaufman, Texas 75142 (the "Kaufman Property").[1]

II.   Findings of Fact

Although being claimed as the homestead of the Debtor, the Kaufman Property is currently titled in the Debtor's deceased father's name, Keller Tinsley.[2] The Debtor, who is now 65 years old, began living with his father on the Kaufman Property in 2004

---

[1] Although the 116 acres are contiguous, the 116 acres are split into a 2-acre tract, on which is situated a three-bedroom, 1,500 square-foot house built in 1973, and a 114-acre tract of adjoining pasture land.

[2] There are no mortgage liens on the Kaufman Property.

after his father became ill. Keller Tinsley purchased the Kaufman Property in 1979. Between 2004 and 2008, the Debtor stayed at the Kaufman Property every day to help care for his father and operate his own business at the Kaufman Property, which consisted of "running cattle" and growing hay.[3] The Debtor's father passed away on September 24, 2008. The Debtor's father's will (the "Will") left the Kaufman Property to the Debtor, and an order admitting the Will to probate was entered on March 20, 2009.[4] However, six months later when the Debtor filed his bankruptcy, title to the Kaufman Property had still not been transferred to the Debtor (and still has not), as his father's Will is still in probate.[5]

Shortly after his father passed away, the Debtor married Debra Doss ("Ms. Doss") on October 14, 2008.[6] After the Debtor's marriage to Ms. Doss, he continued to spend all of his days at

---

[3] The Debtor also testified at a deposition on June 7, 2010 that he had been using the Kaufman Property to operate his business since 1993 (*i.e.*, long before he moved in with his father). *See* AgriLand Exhibit 13, pg. 20.

[4] *See* AgriLand Exhibit 6 and 7.

[5] The Debtor testified that his father's estate had not been fully administered (*i.e.,* the title to the Kaufman Property had not been transferred to his name) because he wanted to see how his bankruptcy estate was administered.

[6] The Debtor was previously married and obtained a divorce from a prior wife in 2004. After the divorce was finalized, the prior wife was awarded the home they had lived in while married.

the Kaufman Property running his cattle grazing business.[7]  The Debtor also has two horses at the Kaufman Property which he rides two to three times per week.  However, the Debtor spends every night with Ms. Doss at a two-bedroom residence she acquired before marriage, which is located at 14624 County Road 4013B, Kemp, Texas 75143 (the "Kemp Property").[8]  The Kemp Property is approximately 8.1 miles from the Kaufman Property.  Ms. Doss earns her own income as a property manager and photographer.

Although the Debtor has not been spending his nights sleeping at the Kaufman Property, the house at the Kaufman Property is still getting full use.  Specifically, the Debtor's adult son and his family (consisting of his wife and three children) began living in the Kaufman Property in November of 2008.  The Debtor provided testimony at the hearing that he was letting his son's family live on the Kaufman Property rent-free because they needed the space to accommodate their large family.

After the Debtor filed for bankruptcy, he listed the Kemp Property as his mailing address on his bankruptcy petition, however, he designated the Kaufman Property as his homestead in

---

[7] However, there was testimony by the Debtor that at the time he filed for bankruptcy, he was not growing crops on the Property or running cattle on the Property due to issues with his personal health.

[8] Ms. Doss designated the Kemp Property as her homestead before the marriage, on May 17, 2001.  *See* AgriLand Exhibit 11.

4

his bankruptcy schedules.[9] The Debtor testified that he listed the Kemp Property as his mailing address for certain mail (particularly his bankruptcy mail), for safety-security-privacy reasons. However, his voter registration card and his tax returns listed the Kaufman Property as his home address.

III. Conclusions of Law

The commencement of a bankruptcy estate creates an estate encompassing all legal and equitable interests in property of the debtor as of the petition date, including any property that might be exempt. *See* 11 U.S.C. § 541(a) (2010). In any hearing concerning an objection to exemptions, the objecting party has the burden of proving that the exemptions are not properly claimed. *See* Fed. R. Bankr. Proc. 4003(c). The facts and law existing as of the date of the petition govern a debtor's claimed exemptions. *See Zibman v. Tow (In re Zibman)*, 268 F.3d 298, 302 (5th Cir. 2001) (*citing White v. Stump*, 266 U.S. 310, 312 (1924)). The debtor is permitted to exempt property from the bankruptcy estate using either the federal exemptions as set forth in section 522(d) or under applicable state law. *See* 11 U.S.C. § 522(b) (2010).[10] Here, because the Debtor elected to

---

[9] *See* Docket Entry No. 1 in the Debtor's bankruptcy case.

[10] Section 522(b)(2) actually contemplates that states can prohibit their citizens from having the option to choose the federal exemptions set forth in section 522(d), so that only state (or other nonbankruptcy law) exemptions will be available to such citizens (so called "opt-out" states). Texas is not an "opt-out" state.

exempt his property under Texas law, this court must turn to Texas law to interpret his exemption rights. *See Butner v. United States*, 440 U.S. 48, 54-55 (1979). *See also In re Barnhart*, 47 B.R. 277, 279-80 (Bankr. N.D. Tex. 1985).

### A. Does the Debtor Qualify For a Rural Homestead Exemption Under the Texas Constitution and the Texas Property Code?

The State of Texas (through its Constitution and Property Code) famously recognizes one of the broadest homestead exemptions in the United States. *See Denmon v. Atlas Leasing, L.L.C.*, 285 S.W.3d 591, 595 (Tex. App.–Dallas 2009, no pet.). Individuals are entitled to either a rural homestead or an urban homestead. Here, the Debtor is seeking to claim the Kaufman Property as a rural homestead.

First, turning to the Texas Constitution, Article 16, Section 51 of it states:

> *The homestead, not in a town or city, shall consist of not more than two hundred acres of land, which may be in one or more parcels, with the improvements thereon*; the homestead in a city, town or village, shall consist of lot or contiguous lots amounting to not more than 10 acres of land, together with any improvements on the land; provided, that the homestead in a city, town or village shall be used for the purpose of a home, or as both an urban home and a place to exercise a calling or business, of the homestead claimant, whether a single adult person, or the head of a family; provided also, that any temporary renting of the homestead shall not change the character of the same, when no other homestead has been acquired; provided further that a release or refinance of an existing lien against a homestead as to a part of the homestead does not create an additional burden on the part of the homestead property that is

> unreleased or subject to the refinance, and a new lien is
> not invalid only for that reason.

*See* Tex. Const. art. XVI, § 51 (emphasis added).

Next, turning to the Texas Property Code, it similarly provides, at Section 41.002, that:

> if used for the purposes of a rural home, the homestead
> shall consist of: (1) for a family, not more than 200
> acres, which may be in one or more parcels, with
> improvements thereon; or (2) for a single, adult person,
> not otherwise entitled to a homestead, not more than 100
> acres, which may be in one or more parcels, with the
> improvements thereon.

Tex. Prop. Code. Ann. § 41.002(b) (West 2000). Section 41.003 of the Texas Property Code adds that the "temporary renting of a homestead does not change the homestead character if the homestead claimant has not acquired another homestead." Tex. Prop. Code. Ann. § 41.003 (West 1985).

Here, the relevant and undisputed facts show that: (1) the Kaufman Property is not in a town or city; (2) the Kaufman Property is less than 200 acres of land; (3) the Kaufman Property is not within a municipality or its extraterritorial jurisdiction and does not receive three of the services enumerated in Section 41.002(c)(2) of the Texas Property Code; (4) the Debtor is married and has an adult son; (5) the Debtor's adult son is currently staying on the Kaufman Property with his family and helps to work the property; (6) the Debtor's furniture, tools, and most of his personal property (inclusive of a bed, dresser,

television, refrigerator, books, records, and horses) remain on the Kaufman Property (the Debtor keeps only clothing and toiletries at the Kemp Property); and (7) the Debtor works from and regularly spends his time at the Kaufman Property. Applying these facts, it might appear that the Kaufman Property qualifies for homestead protection as rural homestead under a plain reading of the Texas Constitution and the Texas Property Code. However, Texas courts have imposed some additional requirements for an individual to qualify for a homestead exemption. First, homestead protections are only provided to the person or family who has a *present possessory interest* in the subject property. *Laster v. First Huntsville Props. Co.*, 826 S.W.2d 125, 130 (Tex. 1991) (citing *Inwood N. Homeowner's Assoc., Inc. v. Harris*, 733 S.W.2d 632, 636 (Tex. 1987); *Green v. White*, 153 S.W.2d 575, 586 (1941); *Gann v. Montgomery*, 210 S.W.2d 255, 258 (Tex. Civ. App–Ft. Worth 1948, writ ref'd n.r.e.)). Second, a claimant must show a combination of both *overt acts* of homestead usage and the *intention* on the part of the owner to claim the land as a homestead. *See Wallace v. Rogers (In re Rogers)*, 513 F.3d 212, 224 n.9 (5th Cir. 2008).

**B. Does the Debtor Have a Present Possessory Interest in the Subject Property (in Light of the Debtor's Lack of Title)?**

As earlier mentioned, the Debtor's father passed away on

September 24, 2008, and the Will left the Kaufman Property to the Debtor. Although an order admitting the Will to probate was entered on March 20, 2009,[11] title to the Kaufman Property has still not been transferred to the Debtor.[12] The Trustee and AgriLand argue that because the Debtor does not have record title to the Kaufman Property, he does not have a present possessory interest in the Kaufman Property and, therefore, cannot claim it as his homestead. The court is mindful that, more often than not, a debtor has actual title in property before claiming it as homestead property. However, there is relevant authority that extends homestead protections to property in which the debtor does not have actual title.

In *Perry v. Dearing (In re Perry)*, 345 F.3d 303 (5th Cir. 2003), the Fifth Circuit addressed whether a debtor must hold property in fee simple in order to invoke homestead protection. In *Perry*, the debtor claimed as an exempt homestead a 26-acre tract and contiguous 59-acre tract. *Id.* at 310. Certain creditors objected to the designation due to the fact that the debtor alienated title to the 26-acre tract by conveying it to a corporation, American Campgrounds, Inc. (the "Corporation"), in exchange for all of the stock in the corporation. *Id.* As a

---

[11] *See* AgriLand Exhibit 6 and 7.

[12] *See* footnote 5, *supra*.

result of this transfer, the creditors argued that title to the 26-acre tract was in the name of the Corporation at the time of the bankruptcy filing and that the debtor no longer possessed an interest in the 26-acre tract.  However, the debtor responded that, even if the conveyance legitimately transferred title to the 26-acre tract to the Corporation, he reacquired title to the property upon the Corporation's dissolution, which dissolution he believed occurred pre-petition.  *Id.* at 313.

Finding that a claimant need not hold property in fee simple in order to invoke homestead protection under Texas law, the Fifth Circuit held that "when coupled with occupancy of the property, '[a] homestead may attach to any possessory interest, subject to the inherent characteristics and limitations of the right, title, or interest in the property.'"  *Id.* at 314 (citing *Harris County Food Control Dist. v. Glenbrook Patiohome Owners Ass'n*, 933 S.W.2d 570, 577 (Tex. App.–Houston [1st Dist.] 1996, writ denied)).  *See also Gann v. Montgomery*, 210 S.W.2d 255, 258 (Tex. Civ. App.–Fort Worth 1948, writ ref'd n.r.e.) (holding that any possessory interest in a lot or lots, the fee-simple not being required to support it, coupled with the requisite occupancy by the husband and his family, is sufficient to support a homestead claim).  *See also Johnson v. Prosper State Bank*, 125 S.W.2d 707 (Tex. Civ. App.–Dallas 1939), *aff'd*, 138 S.W.2d 1117 (finding that a possessory interest and homestead claim to

inherited property did not originate prior to the death of claimant's parents).  *But see Resolution Trust Corp. v. Olivarez*, 29 F.3d 201, 206 n.6 (5th Cir. 1994) (although noting that "[a] number of Texas cases suggest that absence of record of title completely negates any homestead right, despite occupancy of the property by the homestead claimant," the court declined to address whether the defendant's homestead interest was protected in a tenancy at will).  Specifically, the Fifth Circuit noted in *Perry* that "'[i]t is . . . a well-recognized principle of law that one's homestead right in property can never rise any higher than the right, title, or interest that he owns in the property attempted to be impressed with a homestead right.'"  *Perry*, 345 F.3d at 314-15.  Noting that the debtor's interest in the 26-acre tract had become one of a tenant-at-will, the Fifth Circuit found that the debtor could claim a limited homestead interest in the 26-acre tract and that a homestead interest in the possessory estate of a tenancy at will protected the debtor's interest in the property against all other creditors, except the owner or one with better title.  *Id* at 315.  Moreover,

> '[T]he homestead interest in the possessory estate of a tenancy at will . . . [would] survive judicial foreclosure of the deed of trust and sale of the property,' but 'the longevity of [that] estate [would] depend ultimately upon the decision of the new fee title owner, at whose option the tenancy at will [might] be terminated or extended.'

*Id.* (citing *Olivarez*, 29 F.3d at 205).  Note that the Fifth

Circuit did not comment on who they believed would be the eventual fee owner of the 26-acre tract, and left any determination of such issue to the bankruptcy court.   *Id.*

Applying *Perry's* holding to the Kaufman Property, the court finds that, although the Debtor did not have actual record title to the Kaufman Property as of the Petition Date, he does, at the very least, maintain a possessory interest in the property, as a tenant at will.   The Debtor's continued possession of the Kaufman Property depends upon the will and whim of the current fee simple owner (*i.e.*, the probate estate of his father) and any subsequent owner.   Moreover, since the Debtor is the devisee designated in the Will to receive the Kaufman Property, it appear that the Debtor will imminently become the subsequent fee owner.[13]

---

[13] The court would also note that neither the Trustee nor AgriLand presented any evidence establishing that the Debtor would not receive title to the Kaufman Property once the Debtor's father's estate was fully administered.   The court finds this significant.   In very similar circumstances, another bankruptcy court has found that the fact that a deed to a piece of property was never executed and remained in probate, did not defeat a debtor's claim to a homestead exemption where there was no evidence that the debtor contributed to the delay in distribution of the estate.   *See In re Dougan*, 350 B.R. 892, 896-97 (Bankr. D. Idaho 2006).   While here it is certainly possible that the debtor purposefully delayed administering his father's estate in order to attempt to shield the Kaufman Property from his creditors, there was no evidence presented to show that such intent actually existed (and the "delay" in probating the Will has not been so great as to be patently suspect; the Debtor's father died less than a year before the bankruptcy and the probate of the Will began approximately six months before the bankruptcy).

**C.** **Has the Debtor Shown a Combination of Overt Acts of Homestead Usage and the Intention on His Part to Claim the Land as a Homestead?**

Having established that the Debtor has a present possessory interest in the Kaufman Property that is sufficient to invoke homestead entitlement, the court must now decide whether the Debtor has sufficiently shown both *overt acts* of homestead usage as well as an *intent* to claim the Kaufman Property as his homestead. First, the court would note that a homestead may be owned by the community or may be the separate property of either the husband or wife. *See, e.g. Behrens v. Behrens*, 186 S.W.2d 697 (Tex. Civ. App.–Austin 1945). However, a husband and a wife cannot have separate homesteads. *In re Mitchell*, 80 B.R. 372, 383 (Bankr. W.D. Tex. 1987)*(citing Crowder v. Union Nat'l. Bank of Houston*, 261 S.W. 375, 377 (Tex. 1924)). In other words, in Texas, the homestead is a possessory right which inures to the benefit of a *family unit*. *Mitchell*, 80 B.R. at 381. In this case, the family unit would be the Debtor and Ms. Doss and they, as a family unit, are using two properties. Thus, the court must decide, in light of the dual usage, if it is legally justifiable to treat the Kaufman Property as the family unit's homestead. Although the court heard testimony that Ms. Doss and the Debtor spend all of their evenings sleeping at the Kemp Property, the Debtor has *only* argued that the Kaufman Property is exempt and

13

not the Kemp Property.[14]  Accordingly, the court is not

determining whether **both** the Kemp Property and the Kaufman

Property, as two non-contiguous tracts of land, are somehow both

the Debtor's and Ms. Doss' homestead.[15]

(i.)        **The "Dual Residence Scenario."**

Certain other courts—besides this one—have been confronted

with determining whether a debtor's overt acts of usage and

intent supported a claim for a homestead exemption when dual

properties or residences were within the family unit.  Judge Leif

M. Clark in *Mitchell* dealt with this issue in determining whether

a debtor could exempt a piece of property when there was evidence

that he was actually spending significant time on another piece

of property.  The court thinks it is pertinent to briefly discuss

the facts of that case and certain others that deal with a "dual

---

[14] *See* Debtor's Replies to Objections Filed by the Substitute
Trustee and by Agriland PCA Contesting Debtor's Homestead Exemption
[DE # 19].  The court would note that the Kemp Property is Ms. Doss'
separately owned property (acquired before marriage), and is
technically not part of the Debtor's bankruptcy estate.  11 U.S.C.
§ 541(a)(2010).

[15] One can envision such an argument and, indeed, the Debtor
hinted at such an argument by citing Judge Rhoades' opinion *In re
Palmer*, 391 B.R. 386 (Bankr. E.D. Tex. 2008) in closing arguments.
However, the Debtor neither pleaded both properties to collectively be
a non-contiguous rural homestead, nor put on evidence for the court to
consider such a theory.  Among other things, the court was presented
no evidence as to whether the Kemp Property is also in a rural area
nor evidence that there is a nexus between the noncontiguous tracts
such that the noncontiguous tract supports the residence.  *See
Painewebber Inc. v. Murray (In re Murray),* 260 B.R. 815, 830 (E.D.
Tex. 2001).

residence scenario."

In *Mitchell*, the debtor, Albert Vaughan Mitchell ("Mr. Mitchell"), owned land that had been in his family for almost 80 years (the "Hillsboro Property"). *Id.* at 373. Mr. Mitchell's parents still lived on the land, but had sold it to their son in 1979 on the eve of foreclosure by the first lienholder, evidently to save the farm. *Id.* Mr. Mitchell made payments on the farm and went there frequently on the weekends and sometimes during the week in the summertime. *Id.* In November 1986, Mr. Mitchell remarried and took up residence with his new wife and two children at her home (*i.e.*, her separate property) in Garland, Texas near Dallas (the "Garland Property"). *Id.* During the summer, they would take the children down to the Hillsboro Property for a week at a time. *Id.* Moreover, during the school year, Mr. Mitchell and his wife would go to the Hillsboro Property on the weekends. *Id.*

After Mr. Mitchell filed for bankruptcy in March 1987, he claimed the Hillsboro Property as exempt on his schedules, which was subsequently objected to by one of Mr. Mitchell's creditors. *Id.* at 381. Mr. Mitchell argued that the family's use of both properties rendered both the Garland Property and the Hillsboro Property susceptible to homestead characterization, and that, therefore, he was entitled to designate which property he wanted to claim as exempt. *Id.* Specifically, Mr. Mitchell and his wife

15

testified with great conviction that they preferred living in the
country and, as soon as their children graduated from school,
they would move to the Hillsboro Property permanently.
Specifically, Mr. Mitchell argued that his case fell within the
ambit of those Texas cases which hold that a court may (or, in
fact, was required to) honor a debtor's **subjective intent**, when
more than one property was actually used as a residence, under
circumstances **sufficiently ambiguous** so that determining which
property was the debtor's homestead was impossible merely from
observing how it was used. *Id.* at 381-82. *See also Wooten v.
Jones*, 286 S.W. 680, 687 (Tex. Civ. App.–Austin 1926, writ
dism'd).

### (ii.) <u>Ambiguity Regarding Usage of Dual Properties.</u>

In determining whether this "dual residence doctrine" was
applicable, the bankruptcy court looked to see whether the
physical facts surrounding the debtor's use of the two properties
in question was **so ambiguous** that one could not tell from mere
observation which of the two properties was, in fact, the
debtor's homestead. *Mitchell,* 80 B.R. at 382. If there was no
ambiguity, the designation was immaterial. *Id.* (citing *Panhandle
Constr. Co. v. Cont'l Sav. & Loan Ass'n*, 110 S.W.2d 632, 634-35
(Tex. Civ. App.–1937, writ dism'd)). The court noted that an
"ambiguity" as to usage is very fact intensive. Thus, in order

16

to aid its analysis, the bankruptcy court in *Mitchell* looked to two cases where an ambiguity was demonstrated. *Mitchell*, 80 B.R. at 382.

The first case that *Mitchell* examined was *Am. State Bank & Trust Co. v. Johnston*, 58 S.W.2d 880, 881 (Tex. Civ. App–San Antonio 1933). In *Johnston*, the Johnstons moved onto ranch property that had been in the family for many years and dug wells, built a house, tilled the land, and had three children. *Id.* Ten years later, they purchased two lots in the city of Mercedes, which was about two miles away from the ranch property and also built a house on it. *Id.* They lived in Mercedes during the school term, and through every school year after that. *Id.* While Mr. Johnston spent most of his time on the ranch property engaged in family farming and stock raising, Mrs. Johnston and the children spent the weekends, in good weather, and the time between school terms at the ranch property. *Id.* Based upon these facts, the Texas Civil Court of Appeals found it obvious that an ambiguity existed and that the Johnstons could claim and enforce their homestead exemption upon **either** property. *Id.* at 882.

The second case the *Mitchell* court examined was *Carstens v. Landrum*, 17 S.W.2d 803, 805 (Tex. 1929). In *Carstens*, a father (Mr. Landrum) sent his wife and children to San Antonio for schooling and to earn extra income, while he and his older

17

children continued to work the farm. *Id.* at 803-04. Though most of the furniture and household effects were moved to San Antonio, where Mr. Landrum's wife was living with the younger children in a rented facility, Mr. Landrum continued to live on the farm, renting out part of it and farming part of it. *Id.* Mr. Landrum's married son also lived on the farm and helped him work the farm. *Id.* However, shortly after taking out a loan on the farm, the family moved to a house in San Antonio that they had purchased with the proceeds of the loan. *Id.* They then returned to the farm for a period of three years before returning again to San Antonio. *Id.* The Commission of Appeals of Texas ultimately found, and the Texas Supreme Court agreed, that under the circumstances, the occupancy of the farm by Mr. Landrum and his son "was palpably ambiguous in respect of the homestead exemption." *Id.* at 383.

Comparing the facts surrounding Mr. Mitchell's situation with the facts of *Landrum* and *Johnston*, the bankruptcy court in *Mitchell* was unable to find any ambiguity present. *Mitchell*, 80 B.R. at 383. The bankruptcy court stated that regardless of where Mitchell might have lived before he got married, there was little doubt where he resided once he married his wife. *Id.* Specifically, their children attended school in Garland, he kept his work clothes in Garland, both he and his wife worked in the Dallas area, and neither Mr. Mitchell nor his wife were farmers.

18

*Id.*  Additionally, the bankruptcy court found it important that the Hillsboro Property was already home to Mr. Mitchell's parents and was "not left over from his single days."  *Id.*  Thus, Mr. Mitchell was not entitled to exempt the Hillsboro Property as his homestead.

### (iii.)   There is "Ambiguity" in the Case at Bar With Respect to the Debtor's Overt Acts and His Homestead.

Applying the concepts enunciated in *Mitchell* to these facts, the court finds that there is, indeed, an ambiguity present, as far as whether the Kemp Property or the Kaufman Property is the Debtor's and Ms. Doss's homestead.  Although it is an ***extremely*** close call, the court believes that there are several important facts that are present in this case that differentiate it from a case like *Mitchell*.

First, and perhaps most importantly, the Debtor testified that he spends almost every day at the Kaufman Property taking care of the property and running his farming business (albeit not an extremely profitable business at the moment).  In fact, the only thing the Debtor did at the Kemp Property was sleep.  There was also no evidence presented showing that he had abandoned the property.  In fact, the Debtor testified that he and Ms. Doss were planning on moving to the Kaufman Property once they were able to complete some renovations and his son's children are older.  Moreover, the Debtor and Ms. Doss have no children

19

residing at the Kemp Property (which would be a meaningful factor), while the Debtor, of course, does have an adult son and grandchildren at the Kaufman Property.  The Debtor testified with credibility that he considers the Kaufman Property his "principal residence."  While his new bride is eight miles down the road, the Debtor's horses, boots, tools, livelihood the past 17 years, and now extended family are at the Kaufman Property 365 days a year.  The court thinks that all of this is enough evidence to at least rise to the level of creating an "ambiguity" as to which property is really the Debtor's homestead.  Accordingly, the court believes that it should defer to and honor the Debtor's **subjective intent**, as well as the Texas Constitution's liberal construction of the homestead statutes, and permit the Debtor to designate the Kaufman Property as his homestead.[16]

### D.   Is the Debtor's Homestead Exemption Capped Under Section 522(p)(1) of the Bankruptcy Code?

Having found that the Debtor is entitled to a homestead exemption for the Kaufman Property under Texas law, the court must now determine whether the homestead exemption should be capped under section 522(p)(1) of the Bankruptcy Code.  Enacted

---

[16] The court would also point out that, should the Debtor (or Ms. Doss for that matter) file another bankruptcy case in the future, this court's ruling could potentially act as an estoppel to either the Debtor or Ms. Doss claiming that the Kemp Property is somehow now their homestead, unless there was clear and convincing evidence that there was an abandonment of the Kaufman Property.  As pointed out earlier, a married couple (*i.e.*, the family unit) may only have one homestead, and so as long as the Debtor continues to use and occupy the Kaufman Property, Ms. Doss will not be able to claim the Kemp Property as the family unit's homestead.

as part of BAPCPA[17] in 2005, section 522(p)(1) limits a debtor's homestead exemption under certain circumstances. Specifically, section 522(p)(1) provides that "a debtor may not exempt any amount of interest that was **acquired** by the debtor during the 1,215-day period preceding the date of the filing of the petition that exceeds in the aggregate $136,875[18] in value in . . . real or personal property that the debtor or dependant of the debtor claims as a homestead." *See* 11 U.S.C. § 522(p)(1)(D) (2010) (emphasis added). Congress added section 522(p) to the Bankruptcy Code in order to close the so-called "mansion loophole," through which "wealthy individuals could shield millions of dollars from creditors by filing bankruptcy after converting nonexempt assets into expensive and exempt homesteads in one of the handful of states that have unlimited homestead exemptions. . . ." *See Greene v. Savage (In re Greene),* 583 F.3d 614, 619 (9th Cir. 2009). Here, the Debtor argues that section 522(p)(1) does not apply because he has not yet "acquired" title to the Kaufman Property and has, thus, not acquired an interest in property under section 522(p)(1). In the alternative, the

---

[17] *See* the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

[18] Effective April 1, 2010, section 522(p)(1) of the Bankruptcy Code was amended to increase the exemption cap to $146,450. However, per section 104(c) of the Bankruptcy Code, "adjustments made . . . shall not apply with respect to cases commenced before the date of such adjustments." *See* 11 U.S.C. § 104(c) (2010). Here, the Debtor's bankruptcy case was commenced before April 1, 2010, so the $136,875 cap would apply to the Debtor's homestead exemption.

Debtor argues that even if section 522(p)(1) were to apply to his interest in the Kaufman Property, he is excluded from the "cap" on the homestead designation because he qualifies as a family farmer under section 522(p)(2)(A).[19]   The Trustee and AgriLand argue, on the contrary, that the Debtor "acquired" his interest in property upon the death of the Debtor's father, which was within the 1,215-day period preceding the Debtor's bankruptcy filing, and, thus, the Debtor's homestead exemption should be limited to $136,875.   Additionally, the Trustee and AgriLand argue that the Debtor does not qualify as a family farmer because the Debtor is not "engaged in a farming operation" and moreover, the Kaufman Property is not his principal residence.

### (i.) Did the Debtor "Acquire" an Interest in the Kaufman Property Within the 1,215-Day Period Preceding Bankruptcy?

The case of *Wallace v. Rogers (In re Rogers)*, 513 F.3d 212 (5th Cir. 2008) is the prevailing Fifth Circuit authority on determining when a Debtor has "acquired" an interest in property that is subject to the cap set forth in section 522(p)(1). Moreover, *Rogers* is also very factually similar to this case because the debtor in *Rogers* had "acquired" the real property she was attempting to exempt as her homestead *by inheritance*.   In

---

[19] Section 522(p)(2)(A) of the Bankruptcy Code provides that "[t]he limitation under paragraph (1) shall not apply to an exemption claimed under subsection (b)(3)(A) by a family farmer for the principal residence of such farmer."   *See* 11 U.S.C. § 522(p)(2)(A) (2010).

*Rogers*, the debtor, Sarah K. Rogers ("Rogers"), inherited a 72.5 acre tract of real property known as 14849 Kelly Road, Forney, Texas (the "Forney Property") from her mother on January 17, 1994. *Id.* at 216.  Subsequently, Rogers married George E. Rogers, and they purchased a 5.1 acre tract of real property known as 8644 South F.M. 549, Rockwall, Texas (the "Rockwall Property") and, ultimately, constructed a residence on the Rockwall Property and claimed it as their homestead. *Id.*  In January 2004, Rogers separated from her husband, moved into a mobile home on the Forney Property, and claimed the Forney Property as her homestead. *Id.*  On April 6, 2004, Rogers and her husband divorced and Rogers was ultimately allowed to retain the Forney Property as part of the divorce settlement. *Id.*  After a creditor, Jack C. Wallace ("Wallace"), ultimately obtained a judgment in the amount of $316,180.95 against Rogers and her ex-husband, Rogers filed for bankruptcy on September 28, 2005. *Id.*  Rogers claimed her homestead exemption on the Forney Property in the amount of $359,000. *Id.*  Wallace timely objected to the debtor's claimed homestead exemption, arguing that section 522(p)(1) capped the debtor's homestead because Rogers "acquired" the Forney Property within the 1,215-day period preceding bankruptcy (*i.e.*, arguing that the debtor "acquired" the homestead when she first designated it as her homestead in 2004, not when she inherited it in 1994). *Id.*

Following the reasoning set forth in *Venn v. Reinhard*, 377

23

B.R. 315, 319 (Bankr. N.D. Fla. 2007), the Fifth Circuit found
that the **acquisition** of an interest in property and the
**designation** of homestead status are distinct concepts, in that
homestead status attaches to protect property after it is
acquired by the debtor. *Rogers*, 513 F.3d at 220. Moreover, for
purposes of determining whether section 522(p)(1) applies, the
court must decide whether the debtor acquired a **vested economic
interest** in the homestead property during the 1,215-day period.
*Id.* at 225. Designating property as a homestead does not, by
itself, trigger section 522(p)(1), but simply gives "protected
legal security" status to those vested economic interests in
property that were acquired by the debtor earlier. *Id.* Thus,
the Fifth Circuit found that because Rogers "acquired" title to
the property when she inherited it from her mother in 1994 (*i.e.*,
acquired a vested economic interest in the property), which was
outside the statutory period, section 522(p)(1) was not
applicable (even though Rogers did not choose to designate her
property as her homestead until shortly before her 2005
bankruptcy) and, thus, Rogers was entitled to her entire
homestead exemption on the Forney Property.

Unlike in *Rogers*, this case poses a slightly more
complicated factual scenario, due to the fact that the Debtor has
not yet acquired actual legal title to the Kaufman Property.
Thus, the court must decide whether the Debtor has a vested

economic interest in the Kaufman Property, and if so, when such vested economic interest arose.

It is well established that a will speaks of the testator's estate as of the time of the testator's death, and it is the estate of the testator then possessed that passes according to the terms of the will. *Shriners' Hospital for Crippled Children of Texas v. Stahl*, 610 S.W.2d 147, 150 (Tex. 1980). Moreover, title to an estate vests immediately in the beneficiaries (including devisees) at the very moment of the testator's death, though title to the estate is still subject to administration. *See* Texas Prob. Code Ann. § 37 (West 2009) ("when a person dies, leaving a lawful will, all of his estate devised or bequeathed by such will, and all powers of appointment granted in such will, shall vest immediately in the devisees or legatees of such powers . . . ."); *See also Harper v. Swoveland*, 591 S.W.2d 629, 630 (Tex. Civ. App.–Dallas 1979, no writ). In this respect, a right to the property devised is conferred on a devisee as effectively as if the transfer had been in the form of a deed executed by the testator containing the same provisions. *See Ferguson v. Ferguson*, 111 S.W.3d 589, 596 (Tex. App.–Fort Worth 2003, pet. ref'd) (after a will is admitted to probate it becomes a "muniment of title until set aside in some lawful manner").

Thus, applying this statutory authority, the Debtor obtained a vested economic interest in the Kaufman Property on the day his father died (September 24, 2008). Since this date falls within

the 1,215-day period preceding the Petition Date (September 20, 2009), section 522(p)(1) would apply, and the Debtor's homestead exemption in the Kaufman Property would be capped at $136,875 unless an exception applies in section 522(p)(2).[20]

### (ii.) Is the Debtor Excepted From the Cap Under Section 522(p)(1) Because the Debtor Qualifies as a "Family Farmer" under Section 522(p)(2)(A)?

Having determined that section 522(p)(1) does apply to the Debtor's homestead interest in the Kaufman Property, and that the Debtor's homestead exemption would be capped at $136,875, the court must now determine if the Debtor qualifies for an exception to the cap pursuant to section 522(p)(2)(A), which provides that section 522(p)(1) "shall not apply to an exemption claimed . . . by a family farmer for the principal residence of such farmer." *See* 11 U.S.C. § 522(p)(2)(A) (2010). Section 522(p) does not provide a definition of "family farmer" or "principal residence"; however, section 101 of the Bankruptcy Code provides guidance on how such terms should be interpreted.

---

[20] This court had grave doubts whether section 522(p) should apply at all in the context of a homestead "acquired" by devise in a will within 1,215 days of the debtor filing for bankruptcy (in contrast to a homestead acquired with nonexempt assets of a debtor or through other **affirmative** acts of a debtor). "Acquire" seems to connote something more active than passive (gift by will seeming passive). However, the Fifth Circuit assumed without much discussion in *Rogers* that section 522(p) would apply in the context of an acquisition by inheritance. Thus, section 522(p) should presumably be applied to **any** "acquisition," whether affirmative actions on the part of the debtor (or scheming) was involved or not. This is actually consistent with *Black's Law Dictionary's* definition of "acquire," defining it as "to gain by any means" and specifically including taking property by devise. *Blacks's Law Dictionary* 26 (9th ed. 2009).

First, section 101(13A) sets forth the definition of a "debtor's principal residence," which is said to mean "a residential structure, including incidental property, without regard to whether the structure is attached to real property." Although the definition itself states nothing about the residential structure being the principal residence of the debtor, such a limitation should be implied, as Congress would not have intended such nonsensical results. *See* 2 Collier on Bankruptcy ¶ 101.13(A), p. 88-89 (2010). *See also In re Wilson*, 347 B.R. 880, 885-86 (Bankr. E.D. Tenn. 2006) (finding that a debtor's "principal place of residence" is his or her home, the place where the debtor lives with his family, inclusive of any real property acquired therewith).  Applying these standards, it appears that the Kaufman Property would qualify as the Debtor's principal residence.  Here, we have evidence that the Debtor's furniture, tools, and virtually all of his personal property (except for some clothing and toiletries) remain on the Kaufman Property and that the Debtor works from and regularly spends almost every day at the Kaufman Property.  Although the Debtor does spend his nights on the Kemp Property, the court believes there is enough evidence to show that the Kaufman Property is the Debtor's principal residence.  Moreover, since the court has earlier found (in Section III.C of this opinion) that the Kaufman Property qualifies as the Debtor's homestead (per the Debtor's overt acts and subjective intent with regard to the dual

27

residences in his marriage) it would seem that such property would also qualify as the Debtor's principal residence for purposes of Section 522(p)(2)(A).

Next, as to the definition of "family farmer," section 101(18) of the Bankruptcy Code provides that:

> (18) The term "family farmer" means—

> (A) individual or individual and spouse **engaged in a farming operation whose aggregate debts do not exceed $3,544,525** and not less than 50% of whose aggregate noncontingent, liquidated debts (excluding a debt for the principal residence of such individual or such individual and spouse unless such debt arises out of a farming operation), on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or individual and spouse receive from such farming operation **more than 50 percent of such individual's or such individual and spouse's gross income** for—

> (i) the taxable year proceeding; or
> (ii) each of the 2d and 3d taxable years preceding; the taxable year in which the case concerning such individual or such individual and spouse was filed . . .

*See* 11 U.S.C. § 101(18) (2010) (emphasis added). Here, there are three issues the court must analyze in determining whether the Debtor qualifies as a "family farmer": (1) whether the Debtor is "engaged in a farming operation"; (2) whether the Debtor's aggregate debts do not exceed $3,544,525 and whether 50% or more of his noncontingent, liquidated debts (excluding any debt on the principal residence) arises out of farming operations; and (3) whether the Debtor or the Debtor and his spouse received more than 50% of his or their gross income from the farming operation

28

for the taxable year preceding (2008) or each of the second
(2007) and third (2006) taxable years preceding the filing of the
bankruptcy case.

### (1.) *Is the Debtor Engaged in a Farming Operation?*

Whether a debtor is engaging in a farming operation actually
entails two separate questions: (1) whether the debtor's
operation is of the type that constitutes a "farming operation";
and (2) whether the debtor is "engaged" in the farming operation.
*See Cottonport Bank v. Dichiara*, 193 B.R. 798, 801 (W.D. La.
1996).  With regard to what activities constitute a "farming
operation," section 101(21) of the Bankruptcy Code provides that
the term "farming operation" includes "farming, tillage of the
soil, dairy farming, ranching, production or raising of crops,
poultry, or livestock, and production of poultry or livestock
products in an unmanufactured state."  *See* 11 U.S.C. § 101(21)
(2010).  Courts have generally found that the list of activities
enumerated in section 101(21) is merely illustrative and not
exhaustive.  *Cottonport*, 193 B.R. at 801.  Furthermore, if
something is not specifically noted within section 101(21), the
most significant factors courts look to in determining whether a
particular activity constitutes "farming operations" is whether
the debtor is "exposed to the inherent risks and cyclical
uncertainties traditionally associated with farming."  *Id.*
(citing *In re McNeal*, 848 F.2d 170, 171 (11th Cir. 1988)).  Here,
the Debtor testified at the Hearing that he considered himself

29

both a "grazer" and rancher.  Specifically, the Debtor ran cattle
on the Kaufman Property and also grew and baled hay.  However,
the Debtor did not own any of the cattle that he grazed (*i.e.*,
the Debtor allowed other people to graze their cattle on his
land).  The Debtor made a profit on any weight gain of the cattle
that occurred as a result of the grazing.  Keeping in mind the
factors listed above, it appears to the court that the Debtor is
engaged in "farming operations" on the Kaufman Property.  Not
only is the Debtor engaged in activities specifically enumerated
in section 101(21) (*i.e.*, farming, ranching, and raising of
livestock), but the Debtor's business is certainly associated
with the inherent risks and cyclical uncertainty of farming
operations such as the weather and the farming economy.  For
example, the Debtor testified that his farming operation was
greatly impacted due to significant droughts that had occurred in
the area.  Accordingly, the court finds that the Debtor's
business does constitute a "farming operation" for purposes of
section 101(21) of the Bankruptcy Code.

Next, the court must consider whether the Debtor is actually
"engaged" in the farming operation.  In analyzing this particular
issue, courts generally adopt a "totality of the circumstances
approach."  *Cottonport*, 193 B.R. at 802.  *See also In re French*,
139 B.R. 476, 480 (Bankr. D.S.D. 1992); *In re Paul*, 83 B.R. 709,
713 (Bankr. D.N.D. 1988); *Watford v. Fed. Land Bank of Columbia
(In re Watford)*, 898 F.2d 1525, 1528 (11th Cir. 1990) (finding

that the standard for determining if a debtor is "engaged" in farming is whether, in view of the totality of the circumstances, the debtor intends to continue to engage in "farming operations" even though he or she was not engaged in the physical activity at the time the petition was filed). *But see Tart*, 73 B.R. 78, 80 (Bankr. E.D.N.C. 1987) (finding that when debtors had sold all their real property except for their house prior to the filing of the chapter 12 petition and did not intend to continue farming operations, debtors were not "engaged" in farming). This court adopts the totality of the circumstances approach that courts have used when determining if a debtor is "engaged" in farming for purposes of section 101(18) of the Bankruptcy Code. The court also agrees with those courts that, when determining whether a debtor is "engaged" in farming, have looked to the intent of the Debtor who may have ceased operations as of the petition date, due to economic or personal factors.[21]

Here, the Debtor testified at the Hearing that he has been a rancher all of his life, and more particularly, had used the

---

[21] The court believes that this inquiry better serves Congress' intent for a family farmer to be able to reorganize (mainly in the context of Chapter 12), even though the operation of such family farmer may have been drastically altered just prior to filing. *See Watford*, 898 F.2d at 1528. Moreover, since section 101(18) of the Bankruptcy Code (the definition of "family farmer") also provides for an income test, which can look at a debtor's financial situation as much as three years prior to filing, the court believes that there is certainly an argument that it should consider much more than a single snapshot of the debtor's farming operations at the precise time the petition was filed.

Kaufman Property since 1993.[22]   The Debtor admitted at the Hearing that as of the Petition Date, the Debtor no longer grew crops and did not operate a cattle business.  He also admitted that at the time of bankruptcy, he also did not have any cattle or any farming equipment on the Kaufman Property.  The Debtor also testified that he had a heart attack and open heart surgery in 2008, and due to complications with the surgery, the Debtor was temporarily unable to continue his farming operations.  In fact, at the time the Bankruptcy Case was filed, the Debtor was only receiving social security income.  However, the court would note that the Debtor testified that he has now resumed his cattle operations, particularly the grazing business on the Kaufman Property (which includes running cattle and growing hay) and plans on continuing his business in the future.  Accordingly, the court believes that based upon the totality of the circumstances, as well as the Debtor's intent to continue his grazing and ranching business on the Kaufman Property, the Debtor is, for purposes of section 101(18) of the Bankruptcy Code, "engaged" in a farming operation.

> *(2.) Do the Debtor's Aggregate Debts Not Exceed $3,544,525 and Do 50% or More of His Noncontingent, Liquidated Debts Arise Out of Farming Operations?*

Per the Debtor's schedules filed on September 10, 2009, the Debtor's aggregate debts were $196,917.65.  Thus, the Debtor is

---

[22]   *See* AgriLand Exhibit 13, pg. 20.

clearly under the $3,544,525 debt cap for purposes of determining if the Debtor qualifies as a "family farmer" under section 101(18) of the Bankruptcy Code. Moreover, at least $176,415.66 of this debt relates to farming operations (*i.e.*, the amount scheduled as owed to AgriLand). Thus, more than 50% of the Debtor's noncontingent, liquidated debts arise from farming operations.

> *(3.)* *Did the Debtor Receive More Than 50% of His Gross Income from the Farming Operation for the Taxable Year Preceding the Petition Date or Each of the Second and Third Taxable Years Preceding the Petition Date?*

Finally, the court must determine if the Debtor (or the Debtor and his spouse) received more than 50% of his/their gross income from the Debtor's grazing and ranching business.[23] Courts have generally referred to this inquiry as the "Income Test." Here, the Debtor provided the court with copies of his tax returns from 2006, 2007, and 2008.[24] Note that these would be the only relevant tax years to consider, for purposes of Section 101(18)—since the Debtor filed bankruptcy during 2009. Note also that these tax returns all showed only the Debtor's (and not Ms. Doss's) income, since the Debtor did not marry Ms. Doss until late 2008, and they apparently filed separate income tax returns

---

[23] It is significant that the definition of "family farmer" used in section 101(18) of the Bankruptcy Code focuses on "gross" income of the Debtor for purposes of determining whether an individual qualifies, rather than focusing on net income/profit.

[24] *See* Debtor's Exhibits 1, 2, and 3.

for at least that year. For each tax year, the Debtor also submitted as part of his tax returns a Schedule F, which is titled "Profit or Loss From Farming". For 2008, the Debtor reported "farm gross income" as $34,065. For 2008, the Debtor also received social security benefits of $10,752. Thus, for 2008, the Debtor had a total income of $44,817, with 76% coming for the Debtor's farming operations. Therefore, the Debtor has met the requisite income test for being a family farmer under section 101(18) of the Bankruptcy Code. The court would also note that in reviewing the tax returns for 2006 and 2007, the Debtor reported farm gross income of $114,096 and $55,166 respectively. As for other income, the Debtor received $1,021 in 2006 and $7,884 in 2007. This means that farming operations constituted 99% of the Debtor's gross income in 2006 and 88% in 2007. Again, it appears that for 2006 and 2007, the Debtor has also met the requisite income test for being a family farmer under section 101(18) of the Bankruptcy Code.

In summary, the Debtor has met all the various requirements for qualifying as a "family farmer" under section 101(18) of the Bankruptcy Code. Thus, since the Kaufman Property qualifies as the Debtor's principal residence and the Debtor qualifies as a "family farmer," the Debtor is subject to the family farmer exception in section 522(p)(2)(A) of the Bankruptcy Code, and the Debtor's homestead exemption will not be capped at $136,875.

34

V.    Conclusion

The court would conclude with the old saying that "home is where the heart is," and, although the Debtor may have spent his nights with his new bride at the Kemp Property, rather than the Kaufman Property, the facts and circumstances in this case certainly show that the Kaufman Property is the Debtor's true home and where his "heart" is.  This case is certainly unique in that it implicates section 522(p)(1) for reasons not originally contemplated by Congress (*i.e.*, this is hardly a case of letting a debtor get through a "mansion loophole," in that no non-exempt property was put in a large, luxurious mansion on the eve of bankruptcy).  Fortunately, for this Debtor, even though he "acquired" property which he used as his homestead within 1,215 days of filing bankruptcy, Congress anticipated certain situations to which they did not want section 522(p)(1) to apply and drafted section 522(p)(2)(A).

Therefore, the court finds in favor of the Debtor and finds that the Kaufman Property not only qualifies as the Debtor's homestead, but also is not subject to the statutory cap under section 522(p)(1), due to the fact that the Debtor qualifies as a "family farmer" under section 522(p)(2)(A).  Accordingly, the Trustee's and AgriLand's objections are both overruled.

**IT IS SO ORDERED.**

**###END OF MEMORANDUM OPINION AND ORDER###**

35